(No. 89-CC-3369—)

JEFFREY C. OLSON and MONICA K. OLSON, Claimants, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed June 9, 1995.*

*Order on petition for rehearing filed September 29, 1995.*

ZAMPARO & GOLDSTEIN (ROGER ZAMPARO, of counsel), for Claimants.

JIM RYAN, Attorney General (PAUL CHO, Assistant Attorney General, of counsel), for Respondent.

## OPINION

FREDERICK, J.

This case comes before the Court on a two-count complaint sounding in tort filed by Claimants, Jeffrey C. Olson and Monica K. Olson, against the Respondent, State of Illinois. Count I of the complaint seeks $1,000,000 for severe and permanent injuries suffered by Jeffrey Olson. The Claimants allege that Respondent's employees plowed a large amount of snow into the median at the intersection of Route 132 (also referred to as "Grand Avenue") and Oakwood Drive in Warren Township, Lake County, Illinois. They also allege that on January 3, 1988, at 6:20 p.m., Jeffrey Olson was operating his motor vehicle in an easterly direction on Route 132 approaching Oakwood Drive. When he attempted to turn north onto Oakwood Drive, a vehicle proceeding west on Route 132 struck his vehicle. Mr. Olson complains that the large mound of snow at the intersection completely obstructed all lines of vision and Respondent was negligent for creating an unsafe condition or for allowing that condition to remain.

Count II of the complaint prays for judgment in the sum of $200,000 for Monica Olson for the deprivation of Mr. Olson's affection, society, companionship and consortium. A bill of particulars itemizes $95,130.16 in medical and hospital expenses incurred by Jeffrey Olson.

The Respondent's affirmative defenses are:

Jeffrey Olson failed to keep a proper lookout and failed to take appropriate action and therefore was more than 50% of the proximate cause of his injuries;

If contributory fault is less than 50% of the proximate cause, damages should be diminished proportionately;

Monica Olson's loss of consortium claim is derivative and should be acted upon consistently in relation to the first and second affirmative defense; and

Any award should be offset. The Department of Public Aid certified that direct medical payments in the sum of $18,888.85 were paid on behalf of Jeffrey Olson between January 4, 1988, through August 1, 1988.

Each party presented an expert witness and challenged the qualifications and testimony of the opposing party's expert witness. Paul Box was qualified as an expert to testify on behalf of Claimants. Roger Barrette was Respondent's expert. Mr. Barrett's testimony was limited pursuant to an order in limine entered by the Commissioner.

## The Evidence

### Claimants' Case

Claimant, Jeffrey C. Olson, testified that he resided at 18525 Geier Road, Gurnee, Illinois, that he was 42 years of age and had been married to Claimant, Monica K. Olson, for 13 years. He had four children, ages 9 through 15. He had been unemployed for three years. After the accident he worked for SPI in Lake Bluff as a pipefitter for insulation. He could not handle the work because of his injuries and only worked there for three months. He could not lift or bend.

On January 3, 1988, he was traveling home from McDonald's when he was involved in a motor vehicle accident at the intersection of Oakwood and Grand (Route

132). He was driving a Vista Cruiser station wagon on Grand in an easterly direction, approaching Oakwood Drive. As he approached Oakwood, he pulled into the left-hand turn lane and stopped. The turn lane was clear of snow, but across the intersection was a mound of snow that was higher than his automobile.

At the time he entered the left-turn lane and made his first stop, he was facing east and could not see traffic westbound on Route 132. After he stopped at the end of the median and looked, he inched forward approximately ten feet. He still couldn't see a thing so he turned a little more and inched up a third time, started turning north for a few feet, stopped, and could not see. After stopping a third time, he still could not see so he inched forward a few more feet in a northerly direction. The fourth time he moved forward is when he got hit, according to Claimant.

Claimant does not recall being hit and the first thing he remembers is waking up at Condell Memorial Hospital. Claimant was informed that he had a broken neck and was being placed in a helicopter for transport to Milwaukee Hospital. He had vague recollections of his first three weeks in the hospital. He initially could not sit or stand and was in pain and he was experiencing a dull ache in his neck and lower back.

Mr. Olson underwent surgery on his neck. Claimant has a scar on the right side of his neck, a scar on the back of his neck, and another scar on his hip. Claimant also has a tracheotomy scar because he went into respiratory arrest. He had a bone taken out of his hip which was fused to one in his neck to replace the bone that was shattered.

Mr. Olson suffered total paralysis for three days. He was a patient at Froedent Hospital in Milwaukee from

January 4 to February 16, 1988. When he was discharged, he had difficulty walking and had an intravenous feeding tube until late May, 1988.

Mr. Olson received occupational, physical and speech therapy for approximately one year. He testified he could not swallow until late May.

Because of the accident, he cannot help his wife around the house and cannot do anything with his children. He cannot bend down to pick anything up and cannot run, skip, hop, jump or climb. He was diagnosed as being permanently disabled and he is receiving social security (disability) and a VA disability pension.

On cross-examination, Mr. Olson testified that he was unemployed for three and one-half months prior to the accident.

Mr. Olson further testified on cross-examination that on January 3, 1988, the roadway was clear of snow and that, while traveling to McDonald's from his house, he had a good view of the snow mound and thought it to be six or seven feet high.

When Mr. Olson entered the left-turn lane, he testified he was going about 10 to 15 miles per hour and came to a complete stop at the end of the median. He was stopped for 30 seconds while he looked north on Oakwood Drive and east on Grand Avenue. He then pulled forward about ten feet and stopped for 30 seconds to one minute. He inched forward two or three feet and stopped for approximately 30 seconds. While he was stopped, he looked north and east. While stopped at the intersection for a minute and a half to two minutes, he observed cars proceeding west on Grand Avenue but did not see any cars proceeding south on Oakwood Drive. After the third

stop, he inched forward and got hit. At the intersection, westbound Route 132 is two lanes of through traffic and a left-turn lane and right-turn lane. The front end of his car was in the inside through lane (referred to as "fast lane") of westbound Route 132 when it was hit. He started his turn from his third stopped position. Although stating that the front of his car was hit, Mr. Olson admitted that the whole right side of his car was damaged. He never saw the car that hit him.

James Klafeta, a 29-year employee and engineer of operations for the Illinois Department of Transportation ("IDOT"), was called as an adverse witness. He was responsible for snow removal on highways. On the date of the accident, he was an operations engineer and was in charge of snow removal.

Mr. Klafeta stated that there is a Snow and Ice Manual containing the rules and regulations regarding snow removal in the district.

Although familiar with the Snow and Ice Manual ("SIM"), Mr. Klafeta was not familiar with Route 132. He did believe IDOT had the responsibility for snow removal on Route 132. He described the basic procedures that IDOT follows in plowing routes similar to Route 132. Normally, IDOT wants all snow pushed to the right. Although there might be circumstances when snow is plowed onto a median, it would depend on the size and type of the median, but normally snow is not plowed onto medians.

Piles of snow on the pavement create a hazard for the public and are undesirable according to the SIM as snow piles can cause sight obstructions. In the event IDOT personnel were aware of a snow pile, SIM required

that the pavement would be cleared by pushing the snow to the right-hand shoulder with a plow.

On cross-examination, Mr. Klafeta agreed with the proposition that after a storm had been cleared before a holiday weekend, IDOT employees would not be required to inspect roads over a holiday or weekend for snow mounds, absent a complaint.

Nick Vincich, a retired employee of IDOT, was called as a witness by Claimant. He was employed as a highway maintainer, and one of his duties was snow and ice removal. He was assigned to Route 132 from December, 1987, through January, 1988. Mr. Vincich described the plowing procedures for Route 132.

Mr. Vincich explained that he would push the snow from the left lane of Route 132 to the left into the median. When he came to a left-turn lane on Route 132, he would reverse his plow and plow the snow to the right, away from the median. He was familiar with, and identified, the intersection at issue.

When approaching an intersection while plowing the left lane of Route 132, Mr. Vincich would reverse his plow and push snow forward and to the right, but still leave a residue of snow in the intersection. After cleaning the routes, the department cleaned intersections, sometimes pushing snow into the nose or front of a median. He testified that there were times when he and the other plowers pushed snow along the curb or nose of the median in the intersection in question and at times left the snow there.

On cross-examination, Mr. Vincich stated that January 3, 1988, was a Sunday. Although he did not recall whether he worked that day, highway maintainers did not routinely work on Sundays, Saturdays or holidays.

Mrs. Donna Olson, mother of Jeffrey Olson, was presented as a witness. She went to Condell Hospital the night of the accident and noticed that Mr. Olson could not move his arms or hands and was peppered with little glass cuts from the windshield. She saw her son the next day in the neurological intensive care unit at Froedent Memorial Hospital in Milwaukee. His head was bolted to the bed in a "halo" and he still could not move his arms or hands. He was in the hospital for six and one-half weeks and she went to see him almost every day. During this time she noticed he had a tracheotomy, he would choke on his saliva because his throat was paralyzed, he was unable to sleep, and some days he was delirious. Claimant told her that his neck hurt.

Prior to the accident, Mr. Olson played with his children and helped with the housework. Now he cannot bend or stoop, walks with difficulty and falls frequently. He used to like swimming, billiards and bike riding but cannot now do these activities.

Claimant, Monica K. Olson, identified her four children and stated that the oldest was adopted by Jeffrey prior to the accident. The youngest child has Down's Syndrome. Monica is a housewife.

After the accident, Mr. Olson was experiencing respiratory arrest. She described the "contraption" that was bolted to his head. She noticed that Mr. Olson was in pain. He was in intensive care for three weeks and then at the rehabilitation center for three weeks and he was depressed.

After six weeks, Mr. Olson came home from the hospital in a brace but could not eat for a month or two. She had to dress him, help him with his medicine, and help

him with everything for a couple of months. He was very uncomfortable because of the NG-tube in his nose. Mr. Olson lost 40 to 50 pounds.

Mr. Olson visited Dr. Steiner, his family doctor, for check-ups during the recovery period. He had nerve damage and could not feel anything in his fingers as well as other places. Dr. Steiner treated him for impotence for six months after the accident. Prior to the accident, he did not experience sexual problems, was in good health, and was an equal partner in the housework. Prior to the accident, Mr. Olson could play sports, walk, and go to the store with the children, but he cannot do those things now. He cannot walk around the block without getting tired. He can watch TV, or play cards or board games but he cannot do anything that requires physical movement. His general health is getting worse. Monica Olson said it was like taking care of five children instead of four.

On cross-examination, Mrs. Olson agreed that there currently was no decrease in Claimants' sexual relations.

Currently, Mr. Olson does not have any respiratory problems. Mrs. Olson agreed that her husband did not, prior to the accident, participate in an array of activities. Mr. Olson can drive but cannot turn his neck enough to see traffic. Mrs. Olson and all of the children receive social security benefits.

Mr. Paul C. Box, a traffic engineering consultant and president of Paul C. Box and Associates, testified as an expert witness on behalf of Claimants. Mr. Box reviewed polaroid photographs taken by the police the next day, the police accident report, and the complaint. He also conducted a survey of the scene on July 13, 1989. The survey was conducted because it was impossible to tell

the extent of the sight obstruction. Mr. Box did a graphic analysis of determination, which entails doing an accurate survey and drawing and plotting lines of sight on the drawing. He described the method utilized in conducting the survey and estimated the height of the snow mound based upon the photographs taken the day after the accident. He prepared a base drawing which shows basic conditions as he measured them. He then prepared a drawing with details involving estimates of the snow bank and lines of sight plotted in relation to an eastbound left-turning driver facing a westbound vehicle.

Mr. Box explained that the bottom edge of the snow bank in the eastbound left turn lane would affect the lateral or south positioning of Mr. Olson's vehicle. He explained his positioning of the snow in the westbound left-turn lane and the positioning of an eastbound left-turning vehicle and two car fronts westbound, one in the inner lane and the other in the outer lane. There is no way of knowing precisely where Mr. Olson's car was located when he started the left turn. Mr. Box assumed that Mr. Olson began turning left within five feet or so of the estimated end of the snow mound. Although Mr. Box stated that the starting point of the turn could be five feet east or west from where he assumed it to be, the actual starting point was irrelevant as it would not change any opinion he had. Mr. Box then assumed a turning arch or a diagonal path. He determined the height of the snow pile by measuring the height of the sign on the end of the island and looked at the relative position of the snow versus the height. Mr. Box estimated the height of the snow at about 4.3 feet.

Mr. Box drew a line of sight from the assumed driver's eye of the eastbound left-turning driver (Mr. Olson)

to a point where one-third the width of each westbound vehicle could be seen. He then scaled the distance. He determined that the sight line for the eastbound left-turning driver, relative to a westbound vehicle in the inner lane, was about 190 feet. The sight line for the vehicle in the outer lane was about 360 feet.

Mr. Box used references and policies from the American Association of State Highway and Transportation Officials (AASHTO) Policy on Geometric Design of Street and Highways. He utilized an equation taking into consideration the travel distance for the turning vehicle to clear the lane and the posted speed limit of 50 miles her hour. AASHTO policies are utilized by IDOT. A vehicle traveling 50 miles an hour travels 73 feet per second. Mr. Box disregarded that witness Colleen McGrain stated that she was traveling 45 miles per hour because he felt it proper to use posted time. AASHTO policies include a chart to calculate acceleration times for the turning vehicle to clear the westbound lane. Mr. Box also considered driver reaction time. The reaction time of Mr. Olson involved three elements: perception—seeing the oncoming vehicle; and intersection—making the decision to pull out; and volition—actually pushing his foot down to accelerate. One study found 1.1 seconds is a typical reaction time. Although AASHTO recommends two seconds as reaction time, Mr. Box uses one second in his conservative calculations because Mr. Olson did not have to look in both directions.

Mr. Box testified that a car making a left turn from the eastbound turn lane would have to travel 35 feet to clear the inner lane of westbound traffic. According to AASHTO, an average vehicle takes about four seconds to

accelerate from a stop to travel 35 feet, not including reaction time. Utilizing the one second reaction time and the four seconds to safely clear oncoming traffic, the AASHTO policy of geometric design recommends sight distance of about 365 feet for safe crossing under the subject conditions. Mr. Box calculated that 190 feet of sight distance was available to Mr. Olson. Mr. Olson's testimony, and prior depositions, did not impact Mr. Box's calculations because he was determining sight distance for a normal driver driving a standard full-size car. Mr. Box's depiction of the location of the snow bank is only an estimate. He believed witness, Mr. Barrette, calculated a sight distance of 220 feet which he does not believe is a safe distance. Mr. Box opined that the snow bank caused a sight obstruction for Mr. Olson.

On cross-examination, Mr. Box acknowledged he did not interview Mr. Olson or the occurrence witness. He began his analysis and review of material on or about July 10, 1989. He acknowledged that there was no way for him to know precisely where Mr. Olson started his turn and the variance could be five feet east or five feet west. He assumed a turning radius of 50 to 55 feet. He estimated the snow mound to be 4.3 feet in height and that the peak was up to 12 inches north of the hazard sign at the end of the median. He assumed that oncoming vehicles had headlights illuminated. He also assumed the height of Mr. Olson's eye level. Although there are four components to reaction, in this instance Mr. Box did not consider one component, emotion, as a factor in computing reaction time. AASHTO recognizes that the avoidance of accidents depends on the judgment, capability and response of the individual driver.

On redirect examination, Mr. Box indicated that had he used Ms. McGrain's estimate of her speed, 45 miles

per hour, the recommended sight distance would be 330 feet instead of 365 feet for 50 miles per hour, which still did not provide a safe sight distance in this instance because only 190 feet of distance was available. The emotional component of reaction time was not used because he only used half of the recommended value for reaction time. He testified that being that conservative nullifies the effect of many unknown elements.

## Respondent's Case

John Anderson testified that he was a deputy sheriff for the Lake County Sheriff's Department. He was on duty on January 3, 1988, and responded to a call on the subject accident. At the scene of the accident, Mr. Olson told Deputy Anderson that he was attempting to turn left on Oakwood and he could not see around a pile of snow. Deputy Anderson returned to the scene the next day and took photographs. The photographs admitted into evidence depict the subject intersection facing east approximately 80 to 100 feet to the west, the left-turn lane eastbound on Grand Avenue, the intersection from the end of the guardrail facing east, from the end of the left-turn lane, the intersection facing east, almost at the beginning of the left-turn lane of the westbound lanes of Grand Avenue, and the snow mound on the east side of the intersection.

On cross-examination, Deputy Anderson acknowledged that he took pictures of the scene the next day because the snow mound was something out of the ordinary in his experience investigating accidents. Deputy Anderson does not have any special training in accident reconstruction and did not attempt to calculate the distance the vehicles depicted in the photographs were from the camera.

The testimony of Ms. Laurie Ellen Bird, formerly known as Laurie Poole, was presented by virtue of an evidence deposition taken on August 16, 1993. On January 6, 1988, between 6:00 p.m. and 6:30 p.m., she was driving southbound on Oakwood intending to cross Route 132 to Knowles Road. As she was approaching the stop sign on Oakwood, she looked to the left and saw a car westbound in the left lane traveling at approximately 50 miles per hour. She looked to the right to view eastbound traffic and saw a station wagon approaching the left-turn lane at a fast rate of speed. She saw the station wagon in the left-turning lane going too quickly to stop. She felt she was going to be in an accident, so she slammed on her brakes. The station wagon turned in front of the westbound vehicle. The station wagon came into the left-turn lane, traveling very quickly and completely turned without stopping.

She indicated that she had approached the same "intersection several times that season, and knowing that intersection and that there was snow in the median, you had to pull into the intersection before you turn, stop, creep out a little ways, and then make the turn." She described the turning maneuver that she made in that intersection during that season on previous occasions, because a pile of snow existed at the same location as in the case at bar, that caused her to creep around it to see oncoming traffic. She testified that the station wagon did not creep around the snow.

The westbound car hit the station wagon on the passenger side door and front panel. She stayed at the scene approximately 25 minutes until the sheriff arrived. She testified that the eastbound car was driven by a man.

On cross-examination, Ms. Bird testified that she was approximately 50 feet north of the stop sign on Oakwood

when she viewed the accident. She stated that there was snow piled all along the median adjacent to the turning lane used by the station wagon. She testified that the snow was a foot and a half to two feet high.

Roger William Barrette testified as an expert witness on behalf of Respondent. Mr. Barrette explained the method of his survey used to produce a diagram of the subject intersection. His diagram depicts the area covered by snow and he agreed with, and used, Mr. Box's placement and measurements of the snow mound. He and Mr. Box agree the peak height of the snow mound was 4.3 feet. The plan of profile map supplied by the Illinois Department of Transportation specified a 45-foot turning radius. He and Mr. Box also agreed that while in the left-turning lane, Mr. Olson's vehicle was approximately two feet from snow along the median. He placed Mr. Olson's vehicle a few inches from the westbound white lane, as indicated in his deposition.

Mr. Barrette videotaped approximately 35 vehicles making left turns from westbound Grand Avenue to northbound Oakwood to determine the amount of time it took for the vehicles to clear the eastbound lane. He believed five of the vehicles made turns consistent with the turn described by Mr. Olson. It took the five vehicles an average of 2.58 seconds to clear the left lane of westbound traffic.

Mr. Barrette determined that Mr. Olson's line of sight was 220 feet for the left lane of westbound traffic and 420 feet for the right lane of the westbound traffic. A vehicle proceeding in the westbound traffic at 45 miles per hour (66 feet per second) would have travelled 170 feet in 2.58 seconds. If Mr. Barrette used a 50-foot turning radius, instead of the 45-foot radius per IDOT's profile, it would

have decreased Olson's sight line and taken him longer to clear the lane.

On cross-examination, Mr. Barrette acknowledged that he had to make assumptions in determining the location of Mr. Olson's car because there is not any way of determining its exact location. Mr. Barrette acknowledged that the videotape of the five vehicles he used in determining the clearing time was based on his interpretation of what Mr. Olson said in his deposition and he acknowledged that his assumptions and estimates might be wrong. When Mr. Barrette took his videotape it was daylight and there was not a snow mound present. He also did not consider reaction time in his calculations. The determination of 170 feet of sight is not the same as the determination of safe sight distance. Mr. Barrette agrees with Mr. Box's required safe sight distance. On redirect examination, Mr. Barrette indicated that daylight does not affect acceleration rates. He did not consider reaction time because once Mr. Olson placed his foot on the accelerator, there was no hazard to react to.

Colleen Marie McGrain testified that she and a passenger were involved in an accident at the intersection of Route 132 and Oakwood at approximately 6:20 p.m. on January 3, 1988. She was driving a 1984 Buick Regal on dry pavement with her headlights on. She was proceeding west on Route 132 at 45 miles per hour in the left lane closest to the median. She hit a car that approached the left-turn lane for the eastbound traffic. The car approached, hesitated, and then pulled in front of her. She immediately stepped on the brakes and tried to swerve to the right to avoid the car. She estimated that probably a second elapsed from the time the vehicle pulled in front of her to impact. She hit the right passenger side door and wheel well area of a gray with wood panel Oldsmobile

station wagon. She testified that the driver of the station wagon was bleeding in his face and head area and complained of his left arm being numb and tingling. The windshield was shattered and the vehicle's headlights were on. She suffered contusions, bruises, cuts and minor abrasions. She made impact on her steering wheel, windshield and dash.

William Virmond, a maintenance methods manager at IDOT, explained the steps taken by IDOT to clear roads of snow and ice. The clearing of through lanes of traffic are given priority. The shoulders are pushed back to a safe condition. IDOT then goes into a "clean-up operation" and clears medians and other areas where snow might accumulate. Clean-up operations are done during daylight hours. If a citizen called in a complaint about a snow mound after clean-up, IDOT would investigate and clear, if needed, during a regular workday, weekend or holiday. After reviewing a photograph of the subject intersection, Mr. Virmond thought the snow mound was obstructing the left-turn bay for the westbound traffic. Based upon the way it was formed, he thought the plow that put it there appeared to have pushed it from the north in a southerly direction.

IDOT has a budget for winter operations and it does not allow for continuous inspection or monitoring of the roads on weekends or holidays. IDOT has someone on call 24 hours a day the year round.

Mr. Virmond stated that winter storm 11 began December 27, 1987, and ended on December 29, 1987. Storm 12 began on December 30, 1987, and ended on the 31st.

Mr. Virmond monitors the maintenance management information system ("MMIS").

IDOT's personnel do not normally work on holidays, including January 1, 1988. IDOT records indicate IDOT employees did engage in snowplowing on Friday, January 1, 1988. On Saturday, January 2, 1988, three employees worked; one for 4.5 hours (starting at 7:30 a.m.), and the other two for 4.5 and 3.5 hours (starting at 7:30 p.m. and 8:30 p.m.). There are not any recorded entries for work performed on Sunday, January 3, 1988, for snowplowing.

On cross-examination, Mr. Virmond indicated that IDOT's Snow and Ice Manual says that snow is to be kept 300 feet from each side of an intersection of "important intersecting roads." However, he was not familiar with Route 132 and Oakwood Drive.

Also admitted into evidence was the certification by Director Wright of the Illinois Department of Public Aid constituting a lien for medical benefits paid on behalf of Mr. Olson for January 4, 1988, through August 1, 1988, in the sum of $18,888.85.

Claimant's Rebuttal

Mr. Box stated that although AASHTO policies are not binding on IDOT, the policies apply to existing highways regarding sight distances and not just new highway designs. He further testified that it was not proper to calculate sight distance without using driver reaction time.

Testimony Via Joint Exhibit Numbers 1, 2 and 3

Frank G. Thomas, highway commissioner for Warren Township Highway District ("WTHD"), testified that the WTHD plows snow on Oakwood Drive. WTHD plows where Oakwood Drive meets Grand Avenue, but does not plow the medians. WTHD also plows Knowles Road. Apparently some WTHD personnel worked until 3:00 p.m. on December 31, 1987, but no one worked on January 1, 1988. No work was performed by WTHD personnel on

January 2 or 3, 1988. WTHD personnel are told not to plow across the intersection of Route 132.

Dennis Whiston was working for WTHD on the date of the accident. He would have been responsible for plowing Oakwood Drive and Knowles Road during that date. His procedure was to go from east to west to clear the intersection on Oakwood by pushing snow north. When plowing Knowles Road, he plows north toward Route 132 and pulls the snow to the east side of Knowles and south to Grand. He did not go out into Route 132 and never crosses Route 132 with the plows down.

John Rudd was working for WTHD on the date of the accident. He would have plowed Oakwood Drive and Knowles Road during any snow removal operations between December 25, 1987, and January 1, 1988. He plows snow on Knowles Road while traveling north and pushes snow to the edges of the road. He always lifted his plow to cross Route 132, as required by Frank Thomas; otherwise he would have been fired. After crossing Route 132, he cleans the point where Oakwood Drive meets Route 132 by pushing the snow east to west without going onto Route 132. He never plowed snow from Oakwood Drive onto Route 132.

## Claimants' Argument

Claimants argue that the Respondent had a duty to the Claimants to maintain the intersection of Route 132 and Oakwood Drive by not creating an unsafe sight obstruction for drivers making a left turn. They further argue that the State of Illinois had actual or constructive knowledge of the snow mound at the median of the intersection of Route 132 and Oakwood Drive. Claimants' expert, Mr. Box, testified that AASHTO recommends a sight distance of 330 to 365 feet, depending on whether

45 miles per hour or 50 miles per hour is used. However, Mr. Olson only had 190 feet of available sight distance at the time of the accident. They argue that obstructing the line of sight at an intersection constitutes negligence on the part of the State and that the act of creating the snow mound, or the omission in failing to remove it, was the proximate cause of the accident. Claimants deny that Mr. Olson was comparatively negligent and argue that the pain and suffering experienced by Mr. Olson justifies an award of the statutory maximum of $100,000. Claimants request an award to Mrs. Olson in the sum of $100,000 for loss of consortium.

## Respondent's Argument

Respondent argues that Claimants failed to establish that Respondent created the snowbank, and that the snowbank did not create a sight obstruction. Respondent's expert, Mr. Barrette, testified that Mr. Olson had 220 feet of needed sight distance, which was more than enough to see the McGrain vehicle 170 feet east of the intersection. They also argue the State did not have reasonable time to remove the snowbank and that Claimant Jeffrey Olson's contributory negligence was the proximate cause of the accident and operates as a bar to Monica Olson's derivative consortium claim. They also argue that Mr. Olson could have traveled to his home by a safer alternative route. The Respondent claims a set-off in the sum of $18,888.85 for medical assistance paid by the Illinois Department of Public Aid from January 4, 1988, through July 11, 1988.

Claimants assert, in a motion to strike, that Respondent inappropriately referred to certain documents and other material in its brief which were barred by a written prehearing order dated September 24, 1993, and move to strike certain pages of the brief. To the extent Respondent

refers to previously barred information, the Court has disregarded same in rendering this opinion. Claimants also seek to strike the "safe" alternative argument raised by Respondent and to strike any reference to injuries suffered by persons other than the Olsons. The Court does not consider those matters in rendering this opinion.

## The Law

There is no dispute that the accident took place, that a snow mound partially obscured the vision of both Mr. Olson and Ms. McGrain, that Mr. Olson suffered severe and permanent personal injuries, and that the snow mound was in a position that did not comply with the snowplowing procedure of either IDOT or WTHD.

However, the State is not an insurer of all accidents which occur on its highways. The State does have an obligation to keep its highways in a reasonably safe condition. (*Interstate Bakeries Corp. v. State* (1974), 29 Ill. Ct. Cl. 446.) The duty to exercise reasonable care in the maintenance and care of its highways is so that defective and dangerous conditions likely to injure persons using highways should not exist. *Webee v. State* (1985), 38 Ill. Ct. Cl. 164.

The act of removing snow from State highways is surely in furtherance of the legal duty imposed upon the State to keep highways reasonably safe for use as highways. (*Hewitt v. State* (1981), 35 Ill. Ct. Cl. 288.) A Claimant in a negligence action must prove that the State had a duty towards him, that Respondent breached that duty, and that the breach was the proximate cause of Claimant's injury. (*Phillips v. State* (1991), 44 Ill. Ct. Cl. 89.) The Court has also ruled that the State is not liable

unless the Claimant proves that the State has either actual or constructive notice of the dangerous condition for a sufficient time prior to the injury to have taken corrective action. *Webee, supra*, at 168.

Claimants acknowledge that they must show that Respondent had actual or constructive knowledge of the dangerous condition complained of, namely the snow mound. (*Pigott v. State* (1968), 26 Ill. Ct. Cl. 262.) Claimants assert that the State had actual notice of the snow mound since it was the IDOT snowplowing personnel who created the mound. Although the record includes testimony of Mr. Vincich, an IDOT employee, that he was responsible for plowing Route 132 within the weeks prior to the accident, the record does not contain any admission that an IDOT employee created the snow mound. Mr. Vincich testified that he plowed snow which fell during storms #11 and #12 but all removal operations were completed before the end of December 31, 1987.

Mr. Vincich did indicate that when cleaning an intersection, he would at times push snow from the intersection into the nose of the median. Claimants argue that the circumstantial evidence establishes that IDOT employees created the mound.

Negligence may be shown by circumstantial evidence but liability may not be based upon surmise or speculation as to what might have happened to cause Claimant's injury. (*Phillips, supra*, at 91.) The Court noted in *Phillips* that the Claimants cannot rely on the doctrine of *res ipsa loquitur* as Respondent did not have management and charge of Claimant's automobile. (*Phillips*, at pages 92-93.) No witnesses stated that IDOT created the mound.

There is no evidence that IDOT was aware of the snow mound prior to the accident. There is no evidence in

the record that purports to identify when the snow mound was made. The evidence only indicates the WTHD personnel worked until 3:00 p.m. on December 31, 1987, and did not return to work until after the accident date. Several IDOT employees worked in the general area on January 1 and 2, 1988, but there is no indication of where work was performed and what was accomplished.

Claimants argue in the alternative that Respondent had constructive notice of the snow mound. There is no hard and fast rule in determining when it can be said that the State had constructive notice of a dangerous condition and each case must be decided on its own particular facts. *Bugle v. State* (1967), 26 Ill. Ct. Cl. 173.

Claimants, citing *Smith v. State* (1990), 42 Ill. Ct. Cl. 19, argue that the creation of the snow mound, or the omission of the State in failing to remove it, created a sight obstruction for Mr. Olson, preventing him from safely crossing the intersection and these two facts are the proximate cause of the accident in question. In *Smith*, the Court determined that the State had actual notice of dangerous conditions, i.e. an ice ramp, based upon eight different vehicular occurrences reported in the press and to the police over a few weeks prior to the accident. The *Smith* Court concluded that the State's plowing ultimately resulted in the ice ramp and the State should have, at a minimum, warned persons of the dangerous condition.

The Respondent relies on *Louis v. State* (1983), 35 Ill. Ct. Cl. 741 in requesting denial of the claim. However, the *Louis* Court found that the Respondent had notice of the snow mound but did not have sufficient time to clear the condition.

There are two relevant facts in the record that may show that Respondent had constructive notice of the

snow mound. Ms. Bird testified that she "had approached that intersection several times that season, and knowing that intersection and that there was snow in the median, you had to pull into the intersection before you turn \* \* \*." She knew there was snow in the median from her several approaches to the intersection that season, but there is no indication that she was referring to the same snow mound complained about here.

The other relevant factor is a review of the photographs taken by Deputy Anderson on the date after the accident. It is clear that snow, other than the mound, was piled onto the median. A review of the photographs shows snow covering a large portion of the pavement in the eastbound turn lane of Route 132 utilized by Mr. Olson. Although the testimony of IDOT personnel, Klafeta and Vincich, seems to represent that plowing into a median is not favored by IDOT, in this instance it appears that snow was plowed onto the median adjacent to the eastbound turn lane.

The question of whether the Respondent had constructive notice of the snow mound is more difficult to discern. The earliest known time and date of observation of the snow mound, in the record, is the testimony of Mr. Olson that he saw the snow mound from his vantage point while turning west on Route 132 from Oakwood Drive. This view was at 6:00 p.m. on Sunday, January 3, 1988, approximately 20 to 30 minutes prior to the accident.

Based on the evidence, we find that the Respondent had constructive notice of the snow mound and that Respondent created the snow mound. However, two questions remain. First, it is necessary to resolve the degree that the snow mound created a sight obstruction and

caused the accident. To determine the degree of sight obstruction, the pertinent facts are presented by Mr. Olson, Ms. McGrain, the analyses provided by Mr. Box and Mr. Barrette, and the photographs in Respondent's group exhibit number 2 and Respondent's group exhibit number 6. The second question necessary for determination is whether Mr. Olson was negligent and the extent of negligence. To determine his degree of negligence, if any, the pertinent facts are presented by Mr. Olson, Ms. McGrain and Ms. Bird.

On the question of degree of sight obstruction, the Court finds that the snow mound partially obscured both Mr. Olson's and Ms. McGrain's vision. Mr. Box, Claimants' expert, testified that Mr. Olson only had 190 feet of available sight distance at the time of the accident but needed 330 to 365 feet between him and the approaching McGrain vehicle to travel across the inner lane of traffic and avoid the accident. Mr. Barrette, the Respondent's expert, testified that Mr. Olson had 220 feet of needed sight distance and could easily see the approaching McGrain vehicle when it was as close as 170 feet. The Court finds that, based upon the evidence presented, Mr. Olson's estimated range of vision did not exceed 190 feet and that he needed a minimum of 330 feet of distance between his vehicle and the approaching McGrain vehicle in order to safely cross the inner lane of traffic.

In asserting that Mr. Olson's conduct in stopping and inching forward three times shows that he was not negligent in any way, Claimants contend that the testimony of Ms. McGrain supports his testimony. In *Schuett v. State* (1984), 36 Ill. Ct. Cl. 61, the Court entered an order of award for the Claimant. The *Schuett* Court noted that Respondent admitted plowing snow onto a median of a divided highway. Claimant was in a left-turn lane on

Route 72 where she stopped for a red light at the intersection with Barlett Road. She believed the snow was piled up to eight feet high and blocked her entire view of oncoming traffic. When her light turned green, Claimant proceeded to slowly move her car into the intersection apparently stopping every few feet. The *Schuett* Court held that Claimant was not contributorily negligent in moving "inch by inch" through the intersection.

On the question of Mr. Olson's negligence, the Court gives substantial weight to the testimony of Ms. Laurie Bird, the only non-interested occurrence witness. Her testimony was that Mr. Olson did not stop at the intersection. The is in direct contradiction to Mr. Olson's testimony that he stopped three times and proceeded slowly. Ms. Bird testified she thought the Olson vehicle was traveling too fast to stop. Also of significance is Ms. McGrain's testimony that she saw Mr. Olson's vehicle approach the intersection when Mr. Olson testified he did not see her vehicle as he approached the intersection. Additionally, Ms. McGrain stated that she struck the passenger side door and front wheel well of Mr. Olson's vehicle. Based upon the testimony of Mr. Olson, Ms. Bird and Ms. McGrain, the Court finds Mr. Olson did not literally "inch" his way into Ms. McGrain's lane such that the principles in *Schuett, supra,* would apply. We find the facts in this case to be very similar to those presented in *Aetna Insurance Co. v. State* (1981), 34 Ill. Ct. Cl. 167 where the Court found that Claimant did not "inch out" into the intersection and barred recovery.

The Court further finds, based on the testimony of Ms. Bird, that the snow pile only partially blocked the sight line and that Claimant's negligence was more than 50% of the cause of Claimant's injuries. We find Ms. Bird's testimony to be credible and therefore, the testimony of

Claimant Mr. Olson, as to his driving at the intersection, to be incredible. As Mr. Olson failed to stop and did not inch out into the intersection, his negligence was the proximate cause of his injuries and we so find.

As in *Aetna Insurance Co., supra*, the proximate cause of the collision in the case was the negligence of Claimant driving out into the intersection when he did not know if there was any oncoming traffic. Claimant did not inch out into the intersection but rolled on out into the intersection without stopping. It has long been the rule in this State that it is the duty of persons about to cross a dangerous place to approach it with the care commensurate with the known danger, and when one on a public highway fails to use ordinary precaution while driving over a dangerous place, such conduct is by the general knowledge and experience of mankind condemned as negligence. (*Mounce v. State* (1951), 20 Ill. Ct. Cl. 268.) If Claimant would have inched out into the intersection, he would have avoided the collision. It is clear from Ms. Bird's testimony that Claimant did not inch out and use as much caution as possible.

While Mr. Olson's injuries are severe and his plight sympathetic, Ms. Bird's testimony shows clearly that Claimant's failure to use care and caution at a partially obscured intersection was the cause of the collision. He did not inch out slowly and carefully. He did not stop. He pulled out in front of the oncoming vehicle. As Mr. Olson's negligent driving was the cause of this collision, he is barred from recovering under the law. As Mrs. Olson's claim is a derivative claim for loss of consortium, her claim must also fail against Respondent.

For the foregoing reasons, it is hereby ordered that the claims of Claimants be and hereby are denied.

## ORDER

FREDERICK, J.

This cause comes before the Court on Claimants' petition for rehearing, and the Court having reviewed its opinion and heard oral arguments, and the Court being fully advised in the premises, wherefore, the Court finds:

1. That there is nothing raised in the Claimants' motion which would lead the Court to change its findings and opinion.

2. That the opinion of the Court was the proper decision.

Therefore, it is ordered that the petition for rehearing is denied.